AVRAMSKI LAW, PC
Boris Avramski, Esq.
Nevada Bar No. 11350
602 South 10th Street
Las Vegas, NV 89101
Phone: (702) 522-1808
Fax: (702) 685-3625
Email: avramskilaw@gmail.com
Attorney for Plaintiff

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| LUX STERLING HOLDINGS, LLC, a Nevada Limited Liability Company,<br><br>          Plaintiff,<br><br>    vs.<br><br>ANTHONY MANERBINO, an individual, DAWNA MANERBINO, an individual, PHILIP WHELAN, an individual, AARON GODBOUT, an individual and CNW, LLC, a Colorado Limited Liability Company,<br><br>          Defendants. | Case No.: 16-cv-01240<br><br>**COMPLAINT<br>AND<br>DEMAND FOR JURY TRIAL** |

COMES NOW plaintiff Lux Sterling Holdings, LLC ("Sterling"), by and through its attorney of record, Boris Avramski, Esq., and hereby files this civil action against Defendants Philip Whelan, Anthony Manerbino, Dawna Manerbino, Aaron Godbout, and CNW, LLC ("CNW"):

**NATURE OF ACTION**

1.    This is an action for fraud, deceptive trade practices, and exemplary damages arising from defendants' bad faith misrepresentations and omissions regarding their medical marijuana business. In reasonable reliance on fraudulent misrepresentations and omissions, Sterling entered into unenforceable contracts with defendants and incurred damages in excess of $500,000.00.

**PARTIES**

2.    Plaintiff Lux Sterling Holdings, LLC ("Sterling") is a Nevada limited liability company.

3. Defendant Philip Whelan ("Whelan") is a Canadian resident and citizen who, upon information and belief, holds a beneficial interest in CNW, LLC. Whelan is the father of defendant Dawna Manerbino.

4. Defendant Anthony Manerbino ("Manerbino"), a Colorado resident, is a managing member of CNW, LLC with a 100% ownership interest, which upon information and belief he holds for the benefit of Philip Wheaton, Dawna Manerbino, and himself. Manerbino is Whelan's son-in-law and the husband of defendant Dawna Manerbino.

5. Defendant Dawna Manerbino ("Dawna Manerbino") is a Colorado resident who, upon information and belief, holds a beneficial interest in CNW, LLC.

6. Defendant CNW, LLC ("CNW") is a Colorado limited liability company.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and this action is between citizens of different States.

8. Venue is proper under 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## BACKGROUND

**A.  CNW's Medical Marijuana Business.**

9. Since at least 2013, Godbout and Manbrino have operated a medical marijuana business through their limited liability company, CNW, doing business under the registered trade name "Artisanal Medicinals." Godbout owned a 70% interest in CNW and was chiefly responsible for operating the business. Manerbino owned the remaining 30% interest in CNW and was not actively involved in operating the business.

10. Upon information and belief, Whelan financed Manerbino's ownership interest in CNW and Manerbino has held his interest in CNW for the benefit of Whelan, Dawna Manerbino, and himself.

11. Upon information and belief, Whelan exercises control over Manerbino's interest in CNW.

12. Both Godbout and Manerbino have "Key Employee" Marijuana Occupational Licenses issued by the Marijuana Enforcement Division of the Colorado Department of Revenue (the "MED").

13. CNW has the following three marijuana business licenses issued by the MED:

(i) a Medical Marijuana Center license (type 1), which authorizes the sale of medical marijuana products from a dispensary at 2042 South Bannock Street in Denver, Colorado (the "Dispensary");

(ii) a Medical Marijuana Optional Premises Cultivation license, which authorizes CNW to grow, harvest, and process raw Medical Marijuana product at a facility at 2042 South Bannock Street, Denver, Colorado ("Grow 1"); and

(iii) a Medical Marijuana Optional Premises Cultivation license, which authorizes CNW to grow, harvest, and process raw Medical Marijuana product at a facility at 1901 South Bannock Street, Denver, Colorado ("Grow 2").

**B.  Defendants' Fraudulent Misrepresentations and the Lux Canna Contracts.**

14. During the summer of 2015, Sterling's manager, Phil Neuman, was interested in investing and operating an existing medical marijuana business in Colorado. In late August or early September 2015, Neuman learned that Godbout might be interested in selling CNW's business and Neuman called Godbout to discuss that possibility.

15. During their initial call in late August or early September 2015, Neuman explained that he intended to form Sterling as a new company to acquire an existing medical marijuana business in Colorado and to employ the former business owners as managers for a transitional period of two years. Neuman explained that the transition period was necessary because neither he nor any of the other individuals who would become associated with Sterling were familiar with the complicated regulatory regime governing the medical marijuana business in Colorado. Neuman told Godbout that Sterling would be well positioned to substantially expand CNW's business by bringing expertise in marketing, technology, and organization, and access to capital to the business. Neuman explained, however, that Sterling would rely on the former owners to assure compliance with regulatory requirements.

16. Neuman also explained to Godbout that Sterling intended to operate CNW's

medical marijuana business on a professional and organized basis that would enable it to provide safe, high quality products at reasonable prices and in full compliance with MED regulations. Neuman told Godbout that Sterling was willing to invest substantially in the business with the expectation that once the business was running profitably, Sterling would substantially expand the business by acquiring other Medical Marijuana Center licenses and Optional Premises Cultivation licenses in order to setup other facilities in which to operate dispensaries and grows.

17. Godbout represented to Neuman that CNW's business complied with all applicable Colorado laws and regulations governing the production and sale of medical marijuana products and that he and his partner, Manerbino, had the requisite regulatory knowledge and were available to continue to manage the business during a two-year transitional business. Godbout also told Neuman that the regulatory process would be simplified by structuring Sterling's acquisition of CNW through a joint venture with CNW's members, himself and Manerbino. Godbout proposed that the new joint venture would then enter into an agreement with CNW under which the new joint venture would operate CNW's business for two years before purchasing the business at a fixed price at the end of the two-year transitional period.

18. Over the first two weeks of September 2015, Godbout and Neuman negotiated the following principal terms of the agreement:

    (i) a joint venture between Sterling, Godbout, and Manerbino would be formed by creating a new Colorado limited liability company, Luxembourg Canna Holdings, LLC ("Lux Canna").

    (ii) Sterling would own 99% of Lux Canna and the remaining 1% would be divided between Godbout and Manerbino in proportion to their relative ownership interest in CNW, i.e, 70:30.

    (iii) Lux Canna would enter into an agreement with CNW with the following terms:

        a. Godbout and Manerbino, as managers of Lux Canna, will manage all operations of CNW's medical marijuana business on behalf of Lux Canna under the trade name Artisanal Medicinals for the two year transitional period (the "Two-Year Period");

        b. CNW will transfer to Lux Canna the leases for

       Dispensary/Grow 1 and Grow 2;

  c. Lux Canna will finance all operational costs of the business and be entitled to retain any profits after expenses during the Two-Year Period;

  d. Lux Canna will pay monthly salaries to Godbrout and Manerbino of $4,200 and $1,800, respectively, during the Two-Year Period;

  e. At the Two-Year Period, Lux Canna will purchase 90% of CNW for $1,500,000. Godbout and Manerbino will retain a collective 10% interest in CNW.

  19. On or about Friday, September 11, 2015, a telephone conference was held between Godbout, Manerbino, Neuman, and Colin Conner, the individual who would be designated to represent Sterling's interests in the Lux Canna joint venture. Godbout and Manerbino told Neuman and Conner that CNW's monthly operational expenses would be no more than $10,500. They also reaffirmed Godbout's prior representations that CNW's medical marijuana business was in full compliance with all applicable Colorado regulations. They also represented that the structure of the proposed transaction was legal under all applicable laws and regulations, including Colorado's MED regulations.

  20. During that conversation, Neuman suggested that the parties retain regulatory counsel to confirm that the terms of the transaction were consistent with MED regulations. Godbout and Manerbino advised Neuman that they and CNW's lawyer were very knowledgeable about MED regulations and there was no need to retain special regulatory counsel.

  21. In the September 11, 2015 telephone conference and in telephone calls over the subsequent weekend, Godbout represented that CNW's employees in charge of cultivating and processing marijuana plants had been trained by Godbout and Manerbino personally and that the procedures used for such cultivation and processing complied with all MED regulations. Godbout expressly represented that no pesticides were used in the cultivation process.

  22. Between September 11 and 14, 2015, Conner worked with Godbout to draft a written agreement between Lux Canna and CNW setting forth the agreed-upon terms. The final negotiations took place at Manerbino's home at 2740 Golden Way in Denver. Godbout, Manerbino and Conner were present at Manerbino's home and Neuman participated by

1 telephone. The agreement, a copy which is annexed hereto as Exhibit 1 (the "Lux Canna
2 Contract"), was executed at that meeting. Godbout and Manerbino executed the agreement on
3 behalf of CNW and Conner executed the agreement on behalf of Lux Canna. See Lux Canna
4 Contract (Ex. 1).

5     23. Neuman thereafter prepared an operating agreement between the intended
6 members of Lux Canna, Sterling, Godbout, and Manerbino. A copy of that agreement, which
7 was executed by Neuman on behalf of Sterling and by Godbout and Manerbino on behalf of
8 themselves, is annexed hereto as Exhibit 2 (the "Lux Canna Operating Agreement"). In light of
9 the events described below, however, Lux Canna was never formed as a Colorado limited
10 liability company.

11     24. Upon information and belief, Godbout and Manerbino kept Whelan and Dawna
12 Manerbino fully apprised of their negotiations with Neuman and Conner.

13     25. Upon information and belief, Whelan knew that the representations made by
14 Godbout and Manerbino regarding CNW's compliance with MED regulations were false yet
15 nevertheless directed Manerbino not to disclose that information to Neuman and Conner.

16     26. Upon information and belief, Dawna Manerbino was aware that those
17 representations were false yet intentionally did not disclose that information to Neuman and
18 Conner.

19
**C. Godbout and Manerbino Breach Their Contract Obligations.**
20

21     27. Shortly after execution of the Lux Canna Contract and Lux Canna Operating
22 Agreement (collectively, the "Lux Canna Agreements"), Godbout announced that he was going
23 on vacation to Europe. Neither Godbout nor Manerbino were available to manage the business
24 in direct violation of their obligations under the Lux Canna Agreements. Instead, Conner was
25 left to operate the business without the business and regulatory expertise of either Godbout or
26 Manerbino.

27     28. In early October, Godbout notified Conner that he would continue his vacation in
28 Morocco. Over Conner's objection, Godbout refused to return to Denver to comply with his

contractual obligations to manage the business.

29. Although Godbout and Manerbino were responsible for managing the business under the Lux Canna Contract, they did not do so at any time after September 14, 2015, the date that contract was executed. By default, Conner was left to operate and manage the business after September 14, 2015.

### D. Sterling's Discovery of Defendants' Fraudulent Misrepresentations.

#### 1. Monthly Expenses.

30. By early October 2015, Conner had been operating CNW's business for almost one month. During that first month of operation it became increasingly apparent to Conner that Godbout and Manerbino had misrepresented the monthly expenses of the business. In particular, in Schedule A to the Lux Canna Contract, Godbout and Manerbino had represented:

> Rent, Utilities, Taxes, Insurance, Internet, Water, Alarm, Trash, Licensing, Tags, All Plant Growing Stuff [did not exceed] $10,500.00 Month

*See* Lux Canna Contract (Ex. 1) at Schedule A.

31. In fact, those monthly expenses were at least $30,000.

32. On or about October 15, 2015, Neuman called Manerbino to inform him that CNW's representation as to monthly expenses was false and that Manerbino and Godbout must have known that. Manerbino did not contest that allegation, but assured Neuman that an adjustment in the terms of the transaction could be made to compensate Sterling for the misrepresentation.

33. Manerbino also advised Neuman in mid-October that Godbout had decided to move to California. Manerbino said that he was in the process of buying Godbout's 70% interest in CNW and that he, as CNW's new 100% owner, would compensate Sterling for any injuries. Neuman asserted that (i) CNW, Godbout, and Manerbino were in breach of their contractual obligations; (ii) they had fraudulently induced Sterling into entering the Lux Canna Agreements; and (iii) Sterling intended to hold them accountable for all damages.

#### 2. Use of Pesticides to Grow Product and Other Regulatory

**Violations.**

34. During the first week of January 2016, MED inspectors examined the cultivation and processing operations at Grow 1 and Grow 2. The MED inspectors advised Conner that pesticides had been used on the plants.

35. When Conner confronted Manerbino with the news that MED inspectors had found pesticides on the inventory at Grow 1 and Grow 2, Manerbino admitted that the procedures that he and Godbout had trained the employees to use included the use of a common garden pesticide purchased at Home Depot. Manerbino asserted that the use of the pesticide was common and constituted only a "technical" violation since, according to Manerbino, the same pesticide could be used on outdoor grows.

36. Although the inspectors in January 2016 did not formerly prohibit further sales of the pesticide-tainted product, Conner and Neuman ceased general sales of such products over Manerbino's objections.

37. At or around the same time that MED inspectors reported that pesticides had been used at Grow 1 and Grow 2, Conner learned that inventory had been stolen from the facilities housing the Dispensary/Grow 1 and Grow 2. After questioning CNW's employees, Conner concluded that former employees may have shared keys and/or security access codes to the facilities housing the Dispensary/Grow 1 and Grow 2 with other individuals and that the security of those facilities had been seriously compromised. Conner called Manerbino to express concern that more inventory might be at risk of theft. Manerbino suggested that the product be sold in bulk to a trusted former employee, Neal Kahn, who could store the product in a more secure location. Conner implemented that suggestion in order to prevent pesticide-tainted product from being stolen.

38. Knowing that the use of pesticides to grow medical marijuana products was prohibited by regulation, Neuman and Conner started to question Godbout's and Manerbino's prior representations that CNW's medical marijuana business was in full compliance with MED regulations. They discovered that the business failed to comply in several material respects. For example, they learned that Godbout had entered into sublease for the Dispensary's parking lot.

Not only did that diminish the value of the lease to Sterling, but it violated applicable MED regulations. Neuman and Conner also learned that the location of Grow 2, on the second floor of a building, violated MED regulations. Moreover, Godbout and Manerbino were fraudulently concealing this violation from MED inspectors by relocating the plants and inventory from the second floor to the first floor immediately before regulatory inspections. Godbout and Manerbino also disabled the video cameras on the second floor of Grow 2 in order to avoid creating evidence that Grow 2 was in violation of MED regulations.

      **E.    Sterling Demands to Unwind the Lux Canna Agreements.**

39. In mid-February 2016, Neuman demanded that Manerbino unwind the Lux Canna Agreements in light of CNW's material misrepresentations regarding its marijuana business.

40. The parties thereafter engaged in settlement negotiations. During telephone negotiations, Neuman and Conner learned that all major decisions for CNW were made by Whelan and that Manerbino acted on behalf of CNW only with express authority from Whelan.

41. In order to facilitate the settlement negotiations, Sterling paid the expenses of Whelan, Manerbino, and Dawna Manerbino to travel to Las Vegas for an in-person meeting with Neuman and Conner on Saturday, March 5, 2016. Although the meeting did not result in a settlement, Whelan and Manerbino expressed optimism that a settlement could be reached and they agreed to continue negotiations over the following week.

42. Early on the morning of Tuesday, March 8, 2016, however, Manerbino changed all of the locks on the Dispensary/Grow 1 and Grow 2, thereby locking out Conner and any other representative of Sterling. Manerbino sent a letter to Conner purporting to terminate Lux Canna as CNW's manager. Upon information and belief, Manerbino took these actions at the express direction of Whelan.

43. Manerbino's letter asserts that termination was necessary because the bulk sale of pesticide-tainted product to former CNW employee Neal Kahn violated MED regulations and Lux Canna had not been formed as a Colorado limited liability company. Manerbino, however, was contractually obligated to manage CNW's business on behalf of Lux Canna and had, in fact,

proposed the bulk sale to Kahn as a security measure. In addition, Neuman had told Manerbino in October that Sterling was not proceeding with the formation of Lux Canna as a Nevada limited liability company in light of the contractual breaches and fraud perpetrated by CNW, Godbout, and Manerbino.

44. By March 10, 2016, Whelan and Manerbino apparently realized that Manerbino had no authority to terminate the relationship between CNW and Lux Canna. On that date, Manerbino sent an email to Conner and Neuman, a copy of which is annexed hereto as Exhibit 2, stating:

> I want to make sure you understand that my 3/8 termination letter did not address the relationship between CNW LLC and Lux Canna, other than to terminate the management role of Kyle [Huckaby, the employee who executed the bulk sale transaction,] as Lux Canna's representative.

Manerbino March 10, 2016 email (Ex. 2) (emphasis added).

### F. Manerbino Admits that the Lux Canna Agreements Violate MED Regulations.

45. In his March 10, 2016 email, Manerbino admits that the Lux Canna Agreements are unenforceable because they violate MED regulations:

> After conferring with our attorney, who is well-versed in Colorado marijuana law, we reached the conclusion that the agreement between us is unenforceable as currently structured.

*Id.*

46. Godbout and Manerbino, however, had previously represented to Sterling not only that the Lux Canna Agreements complied with MED regulations but that the agreements had been specifically structured in order to ensure full compliance. Sterling relied on those representations to enter into, and to authorize, the Lux Canna Agreements and to invest hundreds of thousands of dollars into CNW's medical marijuana business.

### COUNT I
### (Fraud – Misrepresentation of Operating Expenses)

47. Sterling repeats the allegations set forth in paragraphs 1 through 46.

48. In the September 11, 2011, telephone call described, supra, at ¶ 16, and in Schedule A of the Lux Canna Contract, Godbout and Manerbino falsely represented that the monthly operating expenses of CNW's medical marijuana business would be no greater than $10,500 (the "Operating Expense Misrepresentation").

49. Godbout and Manerbino made the Operating Expense Misrepresentation on behalf of CNW.

50. At the time they made the Operating Expense Misrepresentation on behalf of CNW, Godbout and Manerbino knew that it was false.

51. At the time they made the Operating Expense Misrepresentation on behalf of CNW, Godbout and Manerbino knew that CNW's monthly operating expenses, exclusive of marketing and their salaries, was in fact at least $30,000.

52. Godbout and Manerbino made the Operating Expense Misrepresentation in order to fraudulently induce Sterling to invest hundreds of thousands of dollars into CNW's medical marijuana business and to enter into, or authorize, the Lux Canna Agreements.

53. Upon information and belief, Godbout and Manerbino engaged in the conduct set forth in paragraphs 48 through 52 at the express direction of Whelan and with the full knowledge of Dawna Manerbino.

54. Upon information and belief, Whelan knew that the Operating Expense Misrepresentation was false and nevertheless directed Manerbino and Godbout to make that misrepresentation to fraudulently induce Sterling to invest hundreds of thousands of dollars into CNW's medical marijuana business and to enter into, or authorize, the Lux Canna Agreements.

55. Upon information and belief, Dawna Manerbino knew that the Operating Expense Misrepresentation was false and nevertheless intentionally did not disclose that fact to Conner and Neuman.

56. Sterling reasonably relied to its detriment on the Operating Expense Misrepresentation and invested hundreds of thousands of dollars into CNW's medical marijuana business and entered into, and authorized, the Lux Canna Agreements.

///

# COUNT II
### (Fraud – Misrepresentation of Compliance with MED Regulations)

57. Sterling repeats the allegations set forth in paragraphs 1 through 56.

58. In the September 11, 2011, telephone call described, supra, at ¶ 16, Godbout and Manerbino made the following false representations (collectively, the "MED Compliance Misrepresentations"):

    (i) CNW's medical marijuana business was in full compliance with all applicable Colorado regulations;

    (ii) The structure of the proposed Lux Canna Agreements was legal and complied with all applicable MED regulations.

59. At the time Godbout and Manerbino made the MED Compliance Misrepresentations, they knew that they were false. In particular, they knew that the terms of the proposed Lux Canna Agreements violated MED regulations and that CNW's medical marijuana business violated MED regulations in at least the following three respects:

    (i) pesticide had been used at Grow 1 and Grow 2 to produce medical marijuana products;

    (ii) the Dispensary's parking lot had been sublet to third parties; and

    (iii) Grow 2 was located on the second floor of the building at 1901 South Bannock Street.

60. Godbout and Manerbino intentionally did not disclose to Sterling that the terms of the proposed Lux Canna Agreements violated MED regulations and that CNW's medical marijuana business violated MED regulations as set forth in paragraph 46 (the "Compliance Omissions").

61. Godbout and Manerbino made the MED Compliance Representations and Omissions on behalf of CNW.

62. By virtue of entering into the Lux Canna Agreements, Godbout, Manerbino, and CNW had a duty to disclose the Compliance Omissions to Sterling.

63. At the time Godbout and Manerbino made the MED Compliance Misrepresentations and Omissions on behalf of CNW, Godbout, Manerbino, and CNW had special and superior knowledge regarding MED regulations and whether CNW's medical marijuana business complied with those regulations.

64. By virtue of their special and superior knowledge, Godbout, Manerbino, and CNW had a duty to disclose the Compliance Omissions to Sterling.

65. At the time they made the MED Compliance Misrepresentations and Omissions on behalf of CNW, Godbout and Manerbino knew that the MED Compliance Misrepresentations were false and that the Compliance Omissions were true.

66. Godbout and Manerbino made the MED Compliance Misrepresentations and Omissions in order to fraudulently induce Sterling to invest hundreds of thousands of dollars into CNW's medical marijuana business and to enter into, and authorize, the Lux Canna Agreements.

67. Upon information and belief, Godbout and Manerbino engaged in the conduct set forth in paragraphs 58 through 66 at the express direction of Whelan and with the full knowledge of Dawna Manerbino.

68. Upon information and belief, Whelan knew that the MED Compliance Misrepresentations were false and the Compliance Omissions were true, yet he nevertheless directed Manerbino and Godbout to make the MED Compliance Misrepresentations and refrain from disclosing the Compliance Omissions in order to fraudulently induce Sterling to invest hundreds of thousands of dollars into CNW's medical marijuana business and to enter into, or authorize, the Lux Canna Agreements.

69. Upon information and belief, Dawna Manerbino knew that the MED Compliance Misrepresentations were false and the Compliance Ommissions were true, yet she intentionally did not disclose that fact to Conner and Neuman.

70. Sterling reasonably relied to its detriment on the MED Compliance Misrepresentations and Omissions and invested hundreds of thousands of dollars into CNW's medical marijuana business and entered into, and authorized, the Lux Canna Agreements.

**COUNT III**
**(Deceptive Trade Practices)**

71. Sterling repeats the allegations set forth in paragraphs 1 through 70.

72. The Operating Expense Misrepresentation and the MED Compliance Misrepresentations and Omissions made by Godbout and Manerbino on behalf of CNW

constitute deceptive trade practices as defined in C.R.S. § 6-1-105.

73. Sterling, in the course of its business, has been injured as a result of the Operating Expense Misrepresentation and the MED Compliance Misrepresentations and Omissions made by Godbout and Manerbino on behalf of CNW.

74. Godbout, Manerbino, and CNW engaged in bad faith by intentionally making the Operating Expense Misrepresentation and the MED Compliance Misrepresentations and Omissions.

### COUNT IV
### (Exemplary Damages)

75. Sterling repeats the allegations set forth in paragraphs 1 through 74.

76. Sterling's injury was attended by circumstances of fraud, malice, and willful and wanton disregard of Sterling's rights by Whelan, Manerbino, Dawna Manerbino, Godbout, and CNW.

77. The acts of fraud, malice, and willful and wanton disregard of Sterling's rights by Whelan, Manerbino, Dawna Manerbino, Godbout, and CNW warrant exemplary damages pursuant to C.R.S. § 13-21-102.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

WHEREFORE, Sterling requests judgment, jointly and severally, against Whelan, Manerbino, Dawna Manerbino, Godbout, and CNW as follows:

    (i) Under Counts I, II, and III, compensatory damages in an amount to be determined by the trier of fact and, to the extent that the Lux Canna Contract or Lux Canna Operating Agreement is determined to be enforceable, rescission of those contracts;

    (ii) Under Count III, treble damages as provided for under C.R.S. § 6-1-113(2)(a);

    (iii) Under Count III, attorneys' fees and costs as provided for under C.R.S. § 6-1-113(2)(b);

    (iv) Under Count IV, exemplary damages in an amount to be

determined by the trier of fact; and

(v) Under Counts I, II, III, and IV, pre- and post-judgment interest, costs and attorneys' fees as well as such further relief as this Court deems just.

Dated this 3rd day of June, 2016.

AVRAMSKI LAW, PC

/s/Boris Avramski

Boris Avramski, Esq.
Nevada Bar No. 11350
AVRAMSKI LAW, PC
602 South 10th Street
Las Vegas, NV 89101
Phone: (702) 522-1808
Fax: (702) 685-3625
Email: avramskilaw@gmail.com
Attorney for Plaintiff

Of Counsel:
Edward Griffith, Esq.
THE GRIFFITH FIRM
45 Broadway, Suite 2200
New York, New York 10006
(212) 363-3784
(212) 363-3790 (fax)